UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM LeBLANC,

              Petitioner,                                    Hon. Richard Alan Enslen

v.                                                           Case No. 1:02-CV-594

MARY BERGHUIS,

              Respondent.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on LeBlanc's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that LeBlanc's petition be **granted**. The Court further recommends that Petitioner be immediately released from custody on bond and that the State of Michigan either retry Petitioner within 120 days or completely release Petitioner from its authority and control.

## BACKGROUND

In July 1997, H.H., Petitioner's 15 year-old step-daughter, accused Petitioner of sexually assaulting her on several occasions over a three year period.[1]  Because there existed no direct evidence

_____

[1]  While H.H. alleged that Petitioner assaulted her on more than one occasion, Petitioner was charged with only a single count based on a single alleged incident.

supporting H.H.'s allegations, Petitioner's trial was reduced to a "he-said, she-said" battle of credibility. The parties presented the testimony of several individuals, the relevant portions of which are as follows:

I.        Prosecution's Case-in-Chief

          A.        H.H.

The alleged victim testified that her mother began dating Petitioner in 1993, several months after the death of her father.  (Trial Transcript, August 25, 1998, 204-05).  Petitioner married H.H.'s mother in August 1996.  H.H. complained that Petitioner would punish her (e.g., ground her) for "dumb reasons" such as eating too much cereal, arguing with her brother, eating her brother's candy, or failing to clean something.  *Id.* at 212, 215, 253.

The alleged victim reported that Petitioner was "always" making sexual comments to her and would even grab her breasts and buttocks in her mother's presence.  *Id.* at 211, 217-18.  Petitioner allegedly had sex with H.H. for the first time in 1994 when she was 12 years of age.  *Id.* at 216-17.  The alleged victim testified that the pair had sex "probably" eight times.  *Id.* at 218, 226.  As previously noted, Petitioner was charged with only a single count of criminal sexual conduct for an incident which allegedly occurred in 1997.

H.H. testified that the incident in question occurred in May 1997, during which time she was employed by a local restaurant.  *Id.* at 203-06.  H.H. testified that while she could not recall the exact date of the alleged incident, it occurred on a Sunday that she worked at the restaurant.  She further testified that the incident occurred on a Sunday that she assisted with brunch at the restaurant.  *Id.* at 206, 305.  The alleged victim worked three Sundays in May 1997, the 11th, 18th, and 25th.  (Trial Transcript, August 26, 1998, 408-09).

H.H. testified, however, that the alleged incident could not have occurred on May 25, 1997, because she did not assist with brunch that day. *Id.* at 409-10. On May 11, 1997, H.H. worked from 12:17 p.m. until 3:31 p.m., at which point she took a break and then worked from 4:02 p.m. until 7:44 p.m. *Id.* at 408-09. The alleged victim testified that the incident could not have occurred on May 11, 1997, because it did not occur on a day on which she worked such a "split shift." (Trial Transcript, August 25, 1998, 208-09). On May 18, 1997, the alleged victim worked from 9:46 a.m. until 3:37 p.m. (Trial Transcript, August 26, 1998, 408-09).

According to H.H., on the day of the alleged incident Petitioner picked her up from work and drove to a nearby dirt road which exited off of Herman Road.[2] (Trial Transcript, August 25, 1998, 206-10). After stopping on the dirt road, Petitioner allegedly told H.H. that this would be the last time that he would have sex with her and that if she would let him penetrate her he would un-ground her. *Id.* at 210-16. According to H.H., Petitioner instructed her to undress and put her foot up on the steering wheel of his truck. *Id.* at 212. H.H. testified that she did as instructed, after which Petitioner allegedly penetrated her. *Id.* at 212-13.

H.H. testified that Petitioner kept a supply of condoms in his dresser drawer and was wearing a condom during this encounter. *Id.* at 213-14. The alleged victim testified that Petitioner did not ejaculate inside her, but instead withdrew prematurely and masturbated to climax while standing outside of his truck. *Id.* at 214. H.H. testified that it was light out when the alleged incident occurred. *Id.* at 216. The alleged victim testified that following this alleged incident, Petitioner drove the two of them home. *Id.* H.H. did not recall whether Petitioner was wearing his police uniform that day or whether he was in civilian clothes. *Id.* at 305.

---

[2]   As discussed below, H.H. was never able to identify the dirt road on which the alleged incident occurred.

The alleged victim testified that Petitioner attempted to have sex with her again in July 1997.  *Id.* at 223, 227.  Petitioner allegedly threatened to make life "hell" for H.H. if she refused his advances.  *Id.* at 223.  The alleged victim testified, however, that she was able to successfully refuse Petitioner's request.  *Id.* at 228.  Later that same day, H.H. telephoned her friend, Lana Camuso.[3]  *Id.* at 223, 227.  H.H. described Camuso as "an adult friend" to whom she felt close and "would talk to about things."  *Id.* at 238-39.  In fact, the alleged victim testified that Camuso was "probably" the adult to whom she felt closest.  *Id.*

According to H.H., she walked to a nearby hotel with two of her brothers, C.H. and Z.L., aged 12 ("almost thirteen") and 2 respectively, and telephoned Camuso using a pay-phone.  *Id.* at 234-35.  The alleged victim telephoned Camuso because she was mad at Petitioner and wanted "to get [her] anger out."  *Id.* at 236, 240.  H.H. told Camuso that "something bad had happened," but that she "couldn't talk because [her] younger brother [C.H.] was there."  (Trial Transcript, August 25, 1998, 240, 243; Trial Transcript, August 26, 1998, 460).  At this point, Camuso allegedly began asking H.H. "yes" or "no" type questions in an attempt to learn what had happened.  (Trial Transcript, August 25, 1998, 240-41).  Eventually Camuso asked H.H. if she had been "raped," to which H.H. responded "yes."  *Id.* at 241.  Camuso then "guessed who it was."  *Id.*  According to the alleged victim, she instructed Camuso not to tell anybody because she "didn't want to leave [her] house" or see her family separated.  *Id.* at 242-43.  The alleged victim testified that she was crying throughout her conversation with Camuso.  *Id.* at 243.  According to H.H., her telephone call to Camuso lasted "maybe five to ten minutes."  *Id.* at 244.

---

[3]  The alleged victim testified that this alleged incident and the subsequent telephone call to Camuso occurred on July 17, 1997.  *Id.* at 246, 278-79.  However, as noted below this conflicts with the testimony of Camuso (who testified the conversation occurred on July 14, 1997), Detective Lady (who testified that he was informed of H.H.'s allegations on July 16, 1997, and interviewed her regarding her allegations on July 17, 1997), and Rosa Breneman (who testified that she interviewed H.H. regarding her allegations on July 17, 1997).

Camuso subsequently informed the police of H.H.'s allegations. (Trial Transcript, August 26, 1998, 350).

H.H. acknowledged that until her July 1997 telephone call to Camuso, she never informed anybody that she was being sexually assaulted by Petitioner. (Trial Transcript, August 25, 1998, 224-26). She offered various explanations for her failure to report her allegations. H.H. testified that she did not report this matter because she did not want to live somewhere else or see her family separated. *Id.* at 224-26, 293. She testified that she did not report her allegations because she felt embarrassed and responsible. *Id.* at 293. H.H. further indicated that she wanted to protect her mother and did not want to disappoint her. *Id.* at 294.

On cross-examination, the alleged victim was questioned about the inconsistencies in her testimony. For example, as noted above H.H. testified on direct that Petitioner drove her home following the alleged incident. However, on cross-examination H.H. acknowledged that she had previously stated to investigators that following the alleged incident Petitioner drove her back to work. *Id.* at 306-08. On direct, H.H. testified that Petitioner did not ejaculate inside of her, but instead withdrew and masturbated to climax while standing outside of his truck. However, on cross-examination H.H. acknowledged that at the preliminary examination she had testified that Petitioner did ejaculate inside her. *Id.* at 314-16. H.H. also acknowledged providing investigators with inconsistent answers with respect to the number of times which Petitioner allegedly assaulted her. *Id.* at 318-23. On several occasions during her testimony, the alleged victim acknowledged that her memory of the alleged events was quite poor. (Trial Transcript, August 25, 1998, 300-02, 309-11, 325; Trial Transcript, August 26, 1998, 395, 403, 405). At one point, she even acknowledged that "I remember different things at different times." (Trial Transcript, August 26, 1998, 403).

The alleged victim testified that she began participating in counseling with Barbara Cross after her allegations against Petitioner were reported to the police. *Id.* at 368. H.H. reported that she was unsure precisely how many times she met with Cross, but thought that it was more than ten. *Id.* at 368-70. According to H.H., when she related her allegations during counseling Cross would respond that certain of her allegations reminded her of some of the other individuals she was counseling. *Id.* at 382. The alleged victim also testified that Cross was directly involved in helping her prepare for her trial testimony. *Id.* at 414-17, 431-36.

B.      Lana Camuso

Camuso met H.H. in April 1996 and thought of her like a sister. *Id.* at 456, 476. H.H. confided in Camuso and told her that she was not happy at home and wanted to instead live with her. *Id.* at 457-58, 487-92. Camuso told H.H. that if the circumstances were right, she could come live with her. *Id.* at 503-04. Camuso was aware that H.H.'s mother did not approve of the relationship between Camuso and H.H. *Id.* at 492. Not surprisingly, Camuso testified that she disliked H.H.'s mother. *Id.*

With respect to the previously described July 1997 telephone call from H.H., Camuso testified that H.H. was "very upset" and crying. *Id.* at 459-65. While H.H. testified that this conversation occurred on July 17, 1997, Camuso testified that the conversation occurred on or about July 14, 1997. *Id.* at 458. In stark contrast to H.H.'s trial testimony that the May 1997 incident occurred in a truck on a dirt road, Camuso testified that H.H. told her that the assault occurred at her residence. *Id.* at 467-68. According to Camuso, H.H. never once mentioned being assaulted in a vehicle. *Id.* at 501-02. Camuso testified that during the July 1997 telephone conversation, H.H. never mentioned whether Petitioner had performed oral sex. *Id.* at 498-99. However, on cross-examination Camuso

acknowledged that at the preliminary examination she testified that H.H. specifically told her that Petitioner had performed oral sex. *Id.* at 499-500. Despite having previously told Camuso that she wanted to leave her family and live with her instead, H.H. allegedly told Camuso that she did not want Camuso to tell anybody what allegedly happened because she did not want to live elsewhere or see her family separated. *Id.* at 470-72.

### C.    Lynne Hamlin-Telgard

Hamlin-Telgard managed the Bluebird restaurant at which H.H. worked in May 1997. *Id.* at 516. Hamlin-Telgard testified that the restaurant did not serve brunch on Mother's Day in May 1997.[4] *Id.* at 518-20.

### D.    Rosa Breneman

Breneman was an employee with the Family Independence Agency (FIA). *Id.* at 526. She interviewed the alleged victim on July 17, 1997. *Id.* H.H. initially told Breneman that she and Petitioner had sex 7-10 times, but later changed her story and reported that the pair had sex only a couple of times. *Id.* at 527-30. Breneman conceded that a "couple" is not consistent with "7-10." *Id.* at 535-40. She also acknowledged that part of her job with the FIA is to act as an advocate to persuade others that alleged victims like H.H. are telling the truth. *Id.* at 541.

---

[4]  Mother's Day was on May 11, 1997, one of the possible Sundays on which H.H. was allegedly assaulted. As previously indicated, H.H. testified that she was assaulted on a day on which she assisted with brunch.

E.      Barbara Cross

Cross testified that she possessed a Master's Degree in Social Work and was the director of the Maple Clinic, a clinic which provided "all kinds of out-patient type of therapy." *Id.* at 542.  Cross testified that she was a member of several professional organizations, including that Association for the Treatment of Sexual Abusers (ATSA).[5]  *Id.* at 543-44.   Cross especially highlighted her alleged membership in the ATSA, stating that

> I've done a variety of work with this particular subject matter.  I'm a member of the Association for the Treatment of Sexual Abusers, so I work with sex offenders as well, do assessments of sex offenders, that type of thing.

*Id.* at 544.

Cross acknowledged that she neither performed nor had received training in statistical research regarding child sexual abuse.  *Id.* at 550.  Cross nonetheless asserted that having read articles on the subject she was qualified to offer statistically-based testimony regarding child sexual abuse.  *Id.* at 550-53.  When pressed on the matter, however, Cross was unable to identify any specific article, study, or research finding which helped form the basis of her opinions.  *Id.*  The trial judge nevertheless permitted Cross to provide allegedly expert testimony regarding the typical symptoms exhibited by child sexual abuse victims.  *Id.* at 554-64.

Cross testified that in cases where sexual abuse against a teenaged female has been "confirmed" it was "typical" for the victim to experience the following: (1) feelings of guilt, (2) embarrassment, (3) belief that the family will be separated, (4) desire to protect the parents, (5)

---

[5]   As discussed below, this testimony appears to have been a complete fabrication by Cross offered in an attempt to improperly bolster her credibility.  LeBlanc has attached to his petition a copy of a letter authored by the Executive Director of the ATSA (subsequent to Petitioner's trial) indicating that Cross was not a member of the ATSA, had never been a member of the ATSA, and, furthermore, had never even applied for membership in the ATSA.  (Dkt. #3 at 155).

reluctance to report the abuse, (6) memory loss/repression, (7) expectation that a friend, once informed of the abuse, will not disclose it to anyone, and (8) delay reporting the abuse. *Id.* at 563-604.  Cross also presented lengthy and detailed testimony regarding statistical evidence which allegedly supported her opinion that these particular factors were consistent with having been sexually abused. *Id.* at 572-604.

In sum, Cross - who had already been "introduced" to the jury as H.H.'s counselor and, therefore, possessing first-hand knowledge of the subject matter of her testimony - stated that the various feelings and behaviors described by H.H. were "typical" of *actual* victims of sexual abuse and, moreover, explained the numerous inconsistencies in her testimony.

F.       Dr. Laura Danz

Dr. Danz, a gynecologist, examined H.H. on July 29, 1997, to determine if "there was any evidence of any trauma."  (Trial Transcript, August 27, 1998, 626-28).  The doctor's examination revealed evidence suggesting that H.H. had engaged in intercourse "a number of times," but revealed no evidence of vaginal trauma or molestation. *Id.* at 630-32, 637.  Dr. Danz testified that H.H. informed her that she wished her mother had "never got together" with Petitioner. *Id.* at 636-37.

II.       Petitioner's Case-in-Chief

A.       John Bailey

Bailey testified that he played golf with Petitioner and Petitioner's father on the afternoon of May 18, 1997, at Cedar Hills Golf Course. *Id.* at 645-46.  He testified that he scheduled their tee time for 4:00 p.m. because Petitioner had to work that day. *Id.* at 661.  Petitioner arrived at the golf course a few minutes after 4:00 p.m., wearing civilian clothes. *Id.* at 649-50.  After playing golf, the trio

returned to Bailey's residence to eat and socialize.  *Id.* at 648-49.  Petitioner departed Bailey's residence at approximately 7:00 p.m.  *Id.* at 649.

       B.     Elmer LeBlanc

Elmer LeBlanc, Petitioner's father, testified that on the afternoon of May 18, 1997, he played golf with Bailey and Petitioner at Cedar Hills Golf Course.  *Id.* at 668-69.  After golfing, the trio returned to Bailey's residence to eat and socialize.  *Id.* at 670-71.

       C.     Ken Lady

Ken Lady was a detective employed by the Michigan State Police.  *Id.* at 689.  He was contacted on July 16, 1997, regarding the allegation that Petitioner had sexually assaulted his step-daughter.  *Id.* at 690.  He interviewed H.H. the following day.  *Id.* at 691-92.  The alleged victim told Lady that she and Petitioner had engaged in sex 7-10 times over the previous three years.  *Id.* at 706-07.  H.H. also told Lady that Petitioner kept condoms in his dresser drawer.  *Id.* at 708-10.

As part of his investigation, Lady investigated the location of the alleged May 1997 incident.  *Id.* at 711-16  Lady testified that the distance between the Bluebird restaurant and where Herman Road began was six miles, a distance which required 10-11 minutes to travel by vehicle.  *Id.* at 711-12.  Lady testified that there existed several gravel roads which exited off of Herman Road, the furthest of which was located 8.2 miles from the Bluebird restaurant, a distance which Lady traveled in 12-13 minutes by vehicle.  *Id.* at 704, 713.  Lady testified that H.H. was unable to identify the dirt road on which the alleged May 1997 incident occurred.  *Id.* at 704, 716.

Lady testified that he interviewed Petitioner on July 17, 1997. *Id.* at 696. Petitioner was surprised by H.H.'s story and adamantly denied her allegations. *Id.* at 718. Lady testified that Petitioner was cooperative and immediately agreed to permit a search of his residence and vehicles. *Id.* at 695-96, 700. Lady testified that the search, which included Petitioner's dresser and the truck in which the alleged incident occurred, uncovered no evidence of condoms, sexual activity, or any evidence supporting H.H.'s claims. *Id.* at 695-700.

Regarding H.H.'s allegations, Petitioner explained to Lady that 3-4 days before he had informed H.H. that because of her failure to mind and respect her mother, he would be assuming responsibility for disciplining her. *Id.* at 701-03. Petitioner informed H.H. that he would discipline her "when it was called for." *Id.* H.H. responded to Petitioner with anger and verbal abuse, telling him that he had no right to discipline her because he was not her father. *Id.* at 702.

D.     C.H.

The alleged victim's younger brother, C.H., testified that he accompanied H.H. when she made the previously discussed July 1997 telephone call to Lana Camuso. *Id.* at 727-28. C.H. testified that he was roller-blading "back and forth past the pay phone" during H.H.'s conversation with Camuso.[6] (Trial Transcript, August 27, 1998, 730). C.H. testified that he heard H.H. tell Camuso that she "wanted to get [Petitioner] out of the house." *Id.* at 731. C.H. testified that H.H. was laughing and smiling during her conversation with Camuso and never once shed a tear. *Id.* He also heard H.H. tell Camuso that "if

---

[6]   Camuso testified that she could hear C.H. in the background during her telephone conversation with H.H. (Trial Transcript, August 26, 1998, 460).

she got rid of [Petitioner], that [her] mom would let her go live with Lana." *Id.* at 733. Finally, C.H. testified that his sister was "mad" because Petitioner attempted to discipline her. *Id.* at 735.

E.   Richard Bailey, Yvonne Ogston, Ronald Carrick, Shawn Anger, and Elaine Bailey

These witnesses each testified that they had known Petitioner professionally and socially for many years and considered him to be a very honest and trustworthy man. *Id.* at 738-72.

F.   Keith Gillis

Gillis was an officer with the Grand Traverse Tribal Police Department. *Id.* at 772. Gillis testified that during the month of May 1997, Petitioner worked the 7 a.m. until 3 p.m. shift. *Id.* at 786. He also testified that the distance between the police station from which Petitioner was stationed and the Bluebird restaurant was 15-20 miles. *Id.* at 784. Gillis also testified that as of May 1997, the police station did not have a locker room in which officers could change their clothes. *Id.* at 787.

G.   Deborah LeBlanc

The alleged victim's mother testified that on June 24, 1992, H.H. got into an argument with her biological father. *Id.* at 789-90. H.H. "screamed" at her father that "she hated him and wished he'd die." *Id.* at 790. Later that very day, H.H.'s father suffered a heart attack and died. *Id.* at 790-91. H.H. took her father's death very hard and soon thereafter began counseling. *Id.* at 794-96.

LeBlanc testified that she first dated Petitioner in January 1993. *Id.* at 797. H.H. initially liked Petitioner. *Id.* In September 1993, LeBlanc and Petitioner began living together. *Id.* at 799-800. Petitioner moved out in May 1994 and returned in late fall/early winter of 1994. *Id.* at 800-03. During

the time that Petitioner had moved out of LeBlanc's residence, H.H. was close to her mother and would confide in her. *Id.* at 803-04. After Petitioner moved out, H.H. never mentioned that Petitioner had sexually assaulted her or otherwise acted inappropriately with her. *Id.* at 804. Later that year, when H.H. learned that Petitioner would be moving back in she never asserted that Petitioner had been abusing her - instead she was "happy" that Petitioner was returning. *Id.*

LeBlanc and Petitioner were married in August 1996. *Id.* at 805. Shortly before the wedding H.H. "started getting upset." *Id.* at 805-06. She told her mother that Petitioner was "never going to be her step-dad [because]. . .she already had a dad." *Id.* at 807. According to LeBlanc, her daughter had a "problem" with the pending marriage. *Id.* After the marriage H.H. "became more sarcastic and moody" and rejected her mother's attempt at discipline. *Id.* at 807-08. LeBlanc testified that her daughter physically assaulted her on numerous occasions. *Id.* at 808-09. Not long after the wedding, H.H. was hospitalized for alcohol poisoning resulting from excessive consumption. *Id.* at 807-09.

Following the marriage, Petitioner began to take a more active role in H.H.'s discipline, to which H.H. responded by asserting that Petitioner "wasn't her dad and he couldn't tell her what to do." *Id.* at 807, 817. During these temper tantrums, which occurred on numerous occasions, H.H. would yell and curse. *Id.* at 818. H.H. began to experience difficulty at school and was physically abusive to her younger brother. *Id.* at 819. H.H. "many times" told her mother that she wanted to move out of the house. *Id.* at 820. Whenever H.H. was not permitted to do something she wanted she would respond by reiterating her desire to move out of the house. For example, H.H. would often state that "if she could get into a foster-care home or that if she could get out and go live with somebody else and get her Social

Security, she could do what she wanted and she wouldn't have to live by rules and have [her parents] trying to run her life." *Id.*

LeBlanc testified regarding H.H.'s relationship with Lana Camuso. H.H. and Camuso referred to each other as "best friends" which disturbed LeBlanc because Camuso was an adult woman with children whereas her daughter was less than 15 years of age. *Id.* at 839. LeBlanc was further disturbed by the fact that Camuso provided her daughter with alcohol and took her places without LeBlanc's knowledge or permission. *Id.* at 839-41. LeBlanc also testified that she once caught H.H. sneaking out in the middle of the night with Camuso. *Id.* at 839-40. LeBlanc confronted H.H. with her concerns regarding their relationship, to no avail. *Id.* at 840.

LeBlanc testified that during the month of May 1997 she always picked H.H. up from work and that Petitioner never picked her up from work. *Id.* at 828. She specifically recalled picking H.H. up from work on May 18, 1997. *Id.* at 830, 880-81. LeBlanc also testified that Petitioner worked on May 18, 1997, after which he arrived home, changed clothes to go play golf, and immediately departed. *Id.* at 829-30. LeBlanc testified that Petitioner generally remained at the police station for approximately 25 minutes following the end of shift to discuss matters with the members of the oncoming shift. *Id.* at 830.

LeBlanc testified regarding an incident that occurred contemporaneously with H.H.'s July 1997 telephone call to Lana Camuso. LeBlanc and Petitioner refused to let H.H. attend an upcoming Wallflowers concert. *Id.* at 820-21. LeBlanc and Petitioner were concerned that "pot and alcohol" would be readily available at the concert and in light of H.H.'s substance abuse problems simply decided that she would not be permitted to attend unless her mother accompanied her. *Id.* at 821-22. H.H. was "livid" that she was not allowed to attend the concert without parental supervision. *Id.* at 823. LeBlanc

testified that as of July 14, 1997, H.H. was still asserting that she wanted to move out of the house. *Id.* at 844.

LeBlanc also testified that she washed and stored the family's laundry, so if Petitioner had been keeping condoms in his dresser drawer she would have known about it. *Id.* at 837-38, 890-91. She testified that she had never observed any condoms in Petitioner's dresser. *Id.* As previously noted, condoms were neither found in Petitioner's dresser nor in any other location.

H.      William LeBlanc

Petitioner testified that he never had sex with H.H. or ever engaged in any inappropriate behavior with her. (Trial Transcript, September 1, 1998, 971).

Petitioner testified that prior to his marriage to Deborah, they experienced no discipline problems with H.H. *Id.* at 928-29. However, after the pair announced their intent to wed, H.H. began experiencing "violent mood swings." *Id.* at 940. As Petitioner testified, H.H. began physically assaulting her mother and verbally assaulting him. *Id.*

Following the wedding, Petitioner began taking a more active role in disciplining H.H. *Id.* at 941. H.H. did not like this and told Petitioner that he had to right to discipline her and that he would never take her father's place. *Id.* at 940. Whenever Petitioner attempted to discipline H.H. she would yell, swear, and storm into her bedroom, slamming the door behind her. *Id.* at 942. H.H. slammed her bedroom door so hard and so often that it soon broke. *Id.*

Petitioner testified that on May 11, 1997, May 18, 1997, and May 25, 1997, he worked the 7:00 a.m. until 3:00 p.m. shift. *Id.* at 951-54. Petitioner did not pick H.H. up from work on any of these days. *Id.* at 956-57. Petitioner testified that the police station at which he worked was 9-10 miles

from home.  *Id.* at 946.  Petitioner testified that on May 18, 1997, he left the police station at approximately 3:30 p.m., at which point he drove home to change clothes.  *Id.* at 953-54.  After changing clothes, Petitioner went to play golf with his father and John Bailey at Cedar Hills Golf Course.  *Id.* at 953-55.

Petitioner testified that in July 1997, he and Deborah were experiencing difficulties with H.H.  *Id.* at 972-73.  Specifically, Petitioner testified that he and Deborah suspected that H.H. was smoking marijuana.  *Id.* at 972.  H.H. responded to this concern by stating to Petitioner and her mother that they did not have the right to choose her friends or run her life and that she was not going to allow them to "make her life a living hell."  *Id.* at 973.

III.        Prosecution's Rebuttal Case

A.        Richard Wiggins

As noted above, John Bailey, Elmer LeBlanc, and Petitioner all testified that on May 18, 1997, the three played golf together at Cedar Hills Golf Course.  Wiggins testified that he was working at Cedar Hills Golf Course on May 18, 1997.  *Id.* at 993-94, 998.  Wiggins testified that he was unable to confirm or deny whether Petitioner played golf at his course on May 18, 1997.  *Id.* at 997-98.  Wiggins also testified that he recalled issuing a single rain check that day, but was unsure what time of day it allegedly rained.  *Id.* at 1000, 1004-05. Wiggins conceded, however, that since more than 90 people golfed at the course that day "rain was not a problem to play that day."  *Id.* at 994, 1000.

B.      Scott Paveglio

Paveglio was employed by a pair of local restaurants.  *Id.* at 1005-06.  He testified that he could neither confirm nor deny whether Petitioner and his wife dined at his restaurants on May 11, 1997.  *Id.* at 1006.

C.      James Loonsfoot

Loonsfoot testified that he was employed as a "road corporal" with the Grand Traverse Band police department.  *Id.* at 1007.  Loonsfoot testified that in the summer of 1996, however, he was employed as a "road sergeant" whose responsibilities included reviewing patrolman's daily time logs. *Id.*  Loonsfoot testified that on July 28, 1996, Petitioner falsified his daily time log, reporting that he took one hour for lunch when he allegedly took 90 minutes for lunch.  *Id.* at 1008-10.  When approached regarding the matter, Petitioner told Loonsfoot that "it was a mistake."  *Id.* at 1011.  There was no evidence that Petitioner on any other occasion ever allegedly falsified his time logs.

On cross-examination, Loonsfoot acknowledged that he had recently been demoted from sergeant to corporal because he was not properly certified.[7]  *Id.* at 1011-12.  Loonsfoot, who was at the time of Petitioner's trial the guardian for H.H., conceded that he was having a financial dispute with H.H.'s mother regarding the payment of H.H.'s Social Security checks.  *Id.* at 1012-13.

_____

[7]   It was revealed at the Ginther hearing that Petitioner conducted the investigation which resulted in Loonsfoot's demotion.  (Hearing Transcript, November 2, 1999, 186-87).  Unfortunately, defense counsel - despite being provided with this information prior to trial - failed to question Loonsfoot on the subject.

D.      Lynne Hamlin-Telgard

Hamlin-Telgard testified that the alleged victim did not work at the Bluebird restaurant on July 4, 1996. *Id.* at 1031

Following a jury trial, Petitioner was convicted of a single count of third degree criminal sexual conduct. (Trial Transcript, September 2, 1998, 1155). Petitioner was sentenced to 6-15 years in prison, a sentence exceeding that called for by the relevant sentencing guidelines.[8]  (Sentencing Transcript, October 13, 1998, 51-52). Petitioner subsequently filed in the trial court a motion for a new trial which was denied. (Motion Transcript, December 22, 1998). On April 23, 1999, Petitioner filed in the trial court a motion seeking a new trial, a Ginther hearing, and re-sentencing. (Dkt. #14). This motion was denied on June 1, 1999. *Id.*  Petitioner subsequently appealed this matter to the Michigan Court of Appeals raising the following issues:

I.       The Defendant, a Native-American policeman, was denied his right to a fair trial by an impartial jury and due process, as guaranteed by the United States Constitution when there was no voir dire on prejudice against Native-Americans or police officers.

II.      The court erred in denying a new trial where a prosecution expert witness lied about her credentials and the existence of studies which supported her opinions; a conviction based on this false testimony denied the Defendant due process of law and a fair trial as guaranteed by the United States Constitution.

III.     The court should not have permitted any "rebuttal" testimony because the testimony was improper rebuttal

---

[8]  This sentence even exceeded the relevant guideline sentence for *first degree* criminal sexual conduct, a crime for which Petitioner was neither charged nor convicted. (Sentencing Transcript, October 13, 1998, 51). The trial court stated that it based its sentence upon the allegedly aggravating nature of Petitioner's conduct.

evidence, impeachment of the Defendant on a collateral matter, a violation of the prohibitions of MRE 404(b) and 608(b) and a denial of the rights to a fair trial and right to notice, as guaranteed by the United States Constitution.

IV.    When the complainant blurted out non-responsive, prejudicial answers to questions, and where the prosecution improperly bolstered the credibility of the complainant, the court should have sustained objections, struck the answers, and granted the Defense request for a mistrial; the Defendant was denied a fair trial, as guaranteed by the United States Constitution, by these "blurt outs" and bolstering.

V.    The court erred when it permitted witnesses to testify about hearsay statements of the complainant that were inadmissible; the court's error denied the Defendant his right to a fair trial and to confront the witnesses against him, as guaranteed by the United States Constitution.

VI.    Defense counsel was ineffective and violated Defendant's right to counsel under the Sixth Amendment of the United States Constitution by his action and inaction throughout the Defendant's trial.

VII.    The combination of errors that occurred at the Defendant's trial, including ineffective assistance of counsel, denied the Defendant his right to a fair trial as guaranteed by the United States Constitution and caused a miscarriage of justice.

VIII.    The Defendant's motion to dismiss charges against him because he had been prosecuted by a prosecutor who was not authorized by Michigan statute or constitution to prosecute him should have been granted; because the motion to dismiss was made after a jury was selected and jeopardy attached, the charges should have been dismissed with prejudice and without further prosecution of the Defendant; re-prosecution of the Defendant would violate the Double Jeopardy prohibition of the United States Constitution.

On September 15, 1999, the court of appeals remanded the matter to the trial court with instructions to conduct a hearing regarding Petitioner's ineffective assistance of counsel claim. (Dkt. #14). The trial court subsequently conducted a lengthy hearing, over a four month period, regarding Petitioner's ineffective assistance of counsel claim. (Dkt. #, 23-26, 28-29, 37). At the conclusion of this hearing the trial court concluded that Petitioner had not been denied the right to the effective assistance of counsel. *People v. LeBlanc*, No. 99-959-FH, Opinion (Leelanau County Cir. Ct., April 10, 2000).

Following the trial court's ruling, the Michigan Court of Appeals re-asserted jurisdiction over Petitioner's appeal. Petitioner also submitted to the court of appeals a supplemental brief specifically appealing the trial court's ruling that he had not suffered a violation of his right to the effective assistance of counsel. In this brief, Petitioner asserted the following claims:

I.  Trial counsel's failure to question white jurors as to prejudices against Native-Americans, where the Defendant was a Native-American married to a white woman accused of having sex with his white step-daughter, was objectively unreasonable and prejudicial to the Defendant.

II.  The failure of Defense counsel to call an important defense witness was objectively unreasonable and prejudiced the Defendant.

III.  The failure to object to a therapist who treated the complainant testifying to a syndrome for sexual abuse was objectively unreasonable and prejudiced the Defendant.

IV.  The failure to produce helpful defense evidence was unreasonable and prejudicial to the Defendant.

V.  Other errors of Defense counsel were objectively unreasonable and prejudiced the Defendant.

Finding that Petitioner had, in fact, been denied the right to the effective assistance of counsel, the Michigan Court of Appeals reversed Petitioner's conviction and remanded the matter to the trial court with instructions that Petitioner be afforded a new trial. *People v. LeBlanc*, No. 217281, Opinion (Mich. Ct. App., February 20, 2001). The Attorney General subsequently moved in the Michigan Supreme Court for leave to appeal the decision by the court of appeals. Petitioner opposed the State's motion, raising the following issues:

I.    The Defendant, a Native-American policeman, was denied his right to a fair trial by an impartial jury and due process, as guaranteed by the United States Constitution when there was no voir dire on prejudice against Native-Americans or police officers.

II.    The court erred in denying a new trial where a prosecution expert witness lied about her credentials and the existence of studies which supported her opinions; a conviction based on this false testimony denied the Defendant due process of law and a fair trial as guaranteed by the United States Constitution.

III.    When the complainant blurted out non-responsive, prejudicial answers to questions, and where the prosecution improperly bolstered the credibility of the complainant, the court should have sustained objections, struck the answers, and granted the Defense request for a mistrial, the Defendant was denied a fair trial, as guaranteed by the United States Constitution, by these "blurt outs" and bolstering.

IV.    The court erred when it permitted witnesses to testify about hearsay statements of the complainant that were inadmissible; the court's error denied the Defendant his right to a fair trial and to confront the witnesses against him, as guaranteed by the United States Constitution.

V.    Defense counsel was ineffective and violated Defendant's right to counsel under the Sixth Amendment of the United States Constitution by his action and inaction throughout the Defendant's trial.

a.      Defense counsel three times during his arguments shifted the burden of proof to the defense, in violation of the Fifth Amendment to the United States Constitution.

b.      Defense counsel failed to request voir dire about prejudice against his client, who was a member of a racial minority against whom prejudice existed in the venue in which the case was tried.

c.      Defense counsel failed to object to inadmissible prejudicial testimony against his client.

d.      Defense counsel failed to present available evidence which would have helped the defense case.

e.      Defense counsel, by his cross-examination of the complainant and the prosecution expert, opened the door to prejudicial, inadmissible evidence that improperly buttressed the credibility of the complainant.

VI.     The combination of errors that occurred at the Defendant's trial, including ineffective assistance of counsel, denied the Defendant his right to a fair trial as guaranteed by the United States Constitution and caused a miscarriage of justice.

The Michigan Supreme Court, "in lieu of granting leave to appeal," simply reversed the decision by the Michigan Court of Appeals and reinstated "the judgment of [the] Circuit Court for the County of Leelanau." *People v. LeBlanc*, No. 118774, Order (Mich., April 3, 2002); *People v. LeBlanc*, 640 N.W.2d 246 (Mich. 2002). On August 21, 2002, LeBlanc filed the present petition for writ of habeas corpus in which he asserts the following claims:

I.      Defense counsel were ineffective and violated Petitioner's right to counsel under the Sixth Amendment of the United States Constitution by their action and inaction throughout the Petitioner's trial.

II.     The Petitioner, a Native-American policeman was denied his right to a fair trial by an impartial jury and due process, as guaranteed by the United States Constitution, where there was no voir dire on prejudice against Native-Americans or police officers.

III.    The Petitioner's conviction, based on the false testimony of an expert witness who lied about her credentials and the existence of studies which supported her opinions, denied the Petitioner due process of law and a fair trial as guaranteed by the United States Constitution.

IV.     The court should not have permitted any "rebuttal" testimony because the testimony was improper rebuttal evidence, impeachment of the Petitioner on a collateral matter, a violation of the prohibitions of Mich. R. Ev. 404(b) and 608(b) and a denial of the right to a fair trial and right to notice, as guaranteed by the United States Constitution.

V.      When the complainant blurted out non-responsive, prejudicial answers to questions, and where the prosecution improperly bolstered the credibility of the complainant, the court should have sustained objections, struck the answers, and granted the defense request for a mistrial; the Petitioner was denied a fair trial, as guaranteed by the United States Constitution, by these "blurt outs" and bolstering.

VI.     The Court erred when it permitted witnesses to testify about hearsay statements of the complainant that were inadmissible; the court's error denied the Petitioner his right to a fair trial

and to confront the witnesses against him, as guaranteed by the United States Constitution.

VII.    The combination of errors that occurred at the Petitioner's trial, including ineffective assistance of counsel, denied the Petitioner his right to a fair trial as guaranteed by the United States Constitution and caused a miscarriage of justice.

## **STANDARD OF REVIEW**

LeBlanc's petition, filed August 21, 2002, is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

The deferential standard articulated by the AEDPA, however, does not apply if the state has failed altogether to review a particular claim. As the Sixth Circuit has indicated, where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." In such circumstances, the court conducts a *de novo* review. *See McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *see also Wiggins v. Smith*, 123 S. Ct. 2527, 2542 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

**I.**         **Ineffective Assistance of Counsel**  (Habeas Claim I)

Petitioner asserts that his trial counsel[9] made numerous prejudicial errors the effect of which deprived him of the right to the effective assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution.  The Court agrees that Petitioner was deprived of his right to the effective assistance of counsel.  Specifically, the Court concludes that counsel erred in the following respects: (1) failing to present the testimony of Dr. Barbara Jones Smith, (2) failing to introduce into evidence letters written by the alleged victim, and (3) failing to question potential jurors as to possible racial bias.

To establish that counsel's performance was constitutionally deficient, Petitioner must first establish that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Accordingly, it must be demonstrated that counsel's actions were unreasonable under prevailing professional norms.  *Id.* at 688.  In making this determination, however, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id.* at 689.

Second, Petitioner must further establish that counsel's performance was prejudicial in that it denied him a fair trial.  *See Id.* at 687; *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996).  He must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of [his trial] would have been different.  A reasonable probability is a probability sufficient to

---

[9]  At trial, Petitioner was represented by two attorneys, Thomas Plachta (lead counsel) and James Hunt.

undermine confidence in the outcome." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005) (quoting *Strickland*, 466 U.S. at 694). When analyzing an ineffective assistance of counsel claim, the Court must consider "the totality of the evidence - both that adduced at trial, and the evidence adduced in the habeas proceeding." *Towns*, 395 F.3d at 257 (quoting *Wiggins v. Smith*, 539 U.S. 510, 536 (2003)).

### A.        Failure to Present Testimony from Dr. Barbara Jones-Smith

As indicated above, the testimony of Barbara Cross was essential to the prosecution's case against Petitioner. Cross offered rationalizations and justifications that allegedly explained the numerous inconsistencies in the alleged victim's testimony. In light of the fact that there existed no direct evidence implicating Petitioner, Cross' allegedly expert testimony assumed great significance.

Prior to trial, defense counsel identified its own potential expert witness with whom to potentially counter Barbara Cross' assertions [10] - Dr. Barbara Jones-Smith, who also counseled the alleged victim previously. (Trial Transcript, August 26, 1998, 386). Defense counsel subpoenaed Dr. Smith to testify at trial and further requested that she bring any records she possessed "regarding counseling, medical, and any other services provided to, or concerning [H.H.] at any time." (Dkt. #3 at 93). However, counsel declined to call Dr. Smith to testify. At the subsequent Ginther hearing, attorney Plachta testified that he made the decision to not call Dr. Smith to testify. (Hearing Transcript, March 1, 2000, 21, 48-52).

When asked the basis for this decision, Plachta stated that

The approach that I determined to be best with regards to Ms. Cross, because she was a counselor as well as a so-called expert as well as a

---

[10] As previously noted, the alleged victim testified that after making her allegations she had participated in counseling with Barbara Cross. Petitioner's attorneys knew this fact prior to trial. (Hearing Transcript, March 1, 2000, 18-19).

> member of the team that evaluates these cases in Grand Traverse County
> and this area, was to basically indicate that Ms. Cross herself had no
> credibility, she was not coming in as some independent person who had
> been retained to look at this in an objective fashion, testify both for the
> Prosecution and the Defense, who had no police ties, but - and who had
> no ties with the alleged victim or the victim - now that the jury has
> reached its verdict - but just the opposite.  That she was, in fact, tied in,
> she was essentially a police agent and had an intensive personal
> relationship with the victim.[11]

*Id.* at 49.

> Plachta further testified that
>
> The second reason was that if it got to be a battle of the experts, it has
> been my experience that the jury in CSC cases often chooses the
> Prosecution expert rather than the Defense expert.  By calling a Defense
> expert, you give some credibility to the Prosecution that these experts are
> of some value in this area and then it just becomes a question of - in this
> case - again looking back at it - obviously, it appears to me that the
> Prosecution witness perjured herself in this case about her qualifications,
> about her belonging to one group that she gave information about -

*Id.* at 51.

The Michigan Court of Appeals concluded that Plachta's failure to question Dr. Smith

violated Petitioner's constitutional right to the effective assistance of counsel.  *People v. LeBlanc*, No.

217281, Opinion at 3-5 (Mich. Ct. App., February 20, 2001).  The Michigan Supreme Court, however,

reversed this determination, concluding that Plachta's performance in this regard constituted a valid

strategic decision, the impact of which "did not come close to depriving the defendant of a fair trial."

*People v. LeBlanc*, 640 N.W.2d 246, 250-51 (Mich. 2002).  This disturbing decision by the Michigan

---

[11]   A review of Plachta's cross-examination of Cross suggests that this was merely a convenient after-the-fact rationalization, as the actual content of his cross-examination reveals little (if any) effort to attempt to discredit Cross as an unobjective "police agent."

Supreme Court is contrary to clearly established Federal law as established by the United States Supreme Court more than twenty years ago.

The *Strickland* Court explained that the right to counsel "plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled." *Strickland*, 466 U.S. at 685 (citations omitted). Counsel, therefore, "has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process. *Id.* at 688 (citation omitted).

As is well recognized, this testing process "will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies." *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) (citation omitted). Accordingly, counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Thus, while strategic decisions "made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," strategic decisions "made after less than complete investigation" are reasonable only "to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91. The Supreme Court recently reaffirmed the continuing vitality of this authority. *See Wiggins*, 539 U.S. at 521-23.

Dr. Smith testified at the Ginther hearing that she was never contacted by either defense attorney to determine what her opinions were or how she might be able to assist in Petitioner's defense. (Hearing Transcript, November 2, 1999, 67-69). This was not disputed by either of Petitioner's trial attorneys. Dr. Smith testified that she had previously treated an unspecified member of H.H.'s family. *Id.* at 68. However, because Petitioner's attorneys failed to secure the necessary release they were unable

to obtain copies of the records relevant to this treatment.[12]  *Id.*  In sum, the decision not to call Dr. Smith to testify was "made after less than complete investigation."  In fact, this decision was made without benefit of *any* investigation or consideration of the relevant facts and circumstances.  In light of the testimony which Dr. Smith would have been able to provide in Petitioner's behalf, Plachta's decision to not call Dr. Smith to testify cannot constitute a reasonable strategic decision.

Dr. Smith possesses a Ph.D. in clinical psychology, specializing in "sex therapy" and "the assessment and treatment of sexual victimization and perpetration."  (Hearing Transcript, November 2, 1999, 62-63).  She testified that she was a "board certified forensic examiner" and a member of the Association for the Treatment of Sexual Abusers.  *Id.* at 63.  Dr. Smith testified that she has presented lectures on numerous clinical psychology topics related to her areas of specialization and, furthermore, had presented testimony - on behalf of both the prosecution and defense - in numerous criminal sexual conduct prosecutions.  *Id.* at 63-64.

Dr. Smith testified that if she had been called to testify at Petitioner's trial she would have presented testimony that Barbara Cross lied about her credentials.  *Id.* at 70.  As noted previously, Barbara Cross testified that she was a member of the Association for the Treatment of Sexual Abusers (ATSA).  (Trial Transcript, August 26, 1998, 543-44).  Cross emphasized her alleged membership in the ATSA, stating that

> I've done a variety of work with this particular subject matter.  I'm a member of the Association for the Treatment of Sexual Abusers, so I work with sex offenders as well, do assessments of sex offenders, that type of thing.

---

[12]  Dr. Smith did not identify which family member she treated - presumably because counsel failed to secure the necessary release - however, the alleged victim testified that she had previously participated in counseling with Dr. Smith.  (Trial Transcript, August 26, 1998, 386).

*Id.* at 544.

Dr. Smith testified, however, that Cross lied about her membership in the ATSA. (Hearing Transcript, November 2, 1999, 70). Moreover, Dr. Smith testified that she was aware of this fact "at the time [Petitioner's] trial occurred." *Id.* That Cross lied about her credentials is further supported by a letter authored by the ATSA's executive director, which states that Barbara Cross, at least as of the date of Petitioner's trial, was not a member of the ATSA and, furthermore, had never been a member nor ever even applied for membership in the organization. (Dkt. #3 at 155). With respect to the significance of Cross' apparently perjured testimony, the following exchange occurred:

Mr. Eaman:[13]   Why is membership in ATSA important to the credentials of people who treat people who are alleging they have been sexually abused?

Dr. Smith:   Well, ATSA is made up of - ATSA represents a body of people who are or can be probation/parole officers, treatment providers, judges, attorneys, basically looking in terms of the management of sex offending, promoting education and training, in terms of the sex offender management, providing ethical treatment for perpetrators and victims, as well as promoting high professional standards and structure for proper treatment and evaluation. And it provides - it provides ongoing research - promotes ongoing research and better clinical knowledge for those of us in the field.

Mr. Eaman:   In other words, it supplies more credibility to your opinion as an expert?

Dr. Smith:   Well, I think so.

---

[13] Mr. Frank Eaman, who represents Petitioner in the present matter, also represented Petitioner at the Ginther hearing.

*Id.* at 71-72.

That Cross was attempting to improperly bolster her credibility by lying about her membership in ATSA is evident from her testimony quoted above.

With respect to the substantive content of Cross' testimony, Dr. Smith testified that Cross' alleged expert opinions reflected numerous errors and misstatements. As discussed above, Cross identified eight symptoms or characteristics which were consistent with having been sexually abused. Dr. Smith disagreed with Cross in this regard, as demonstrated by the following exchange:

> Mr. Eaman: What were those flaws in her testimony you would have been able to testify to?
>
> Dr. Smith: She listed eight symptoms which are not symptoms that are noted as symptoms of sexual abuse. The symptoms of sexual abuse are anxiety, depression, helplessness, withdrawal. I mean, there's a variety of symptoms and there's a number of studies that have looked at that, some are just with children, some are with three-year-olds to eighteen-year-olds, depends on the study you looked at. **The factors that Ms. Cross listed off were part of really what somebody might go through in terms of disclosure, but they aren't symptoms of sexual abuse**. And that feeling embarrassed could be something that you could feel something from other than sexual abuse, it could be a variety of things that one might feel embarrassed about, as an example of one of the seven - one of the eight, excuse me.
>
> Mr. Eaman: Are there studies that list any of these eight that are themes or patterns of sexual abuse?
>
> Dr. Smith: I don't know any studies that list any of those eight.

Mr. Eaman:      Are there studies that list any of these eight that are themes or patterns of sexual abuse?

Dr. Smith:      I don't know any studies that list any of those eight.

Mr. Eaman:      How about any one of them?

Dr. Smith:      Disclosure.  There are studies on disclosure, most of those studies discuss trying to get a handle on what's the process of disclosure, how does somebody go about disclosing something that's dramatic, that's what those are focused on.

Mr. Eaman:      Are there scientific studies that are related to the other seven symptoms, themes or patterns, that she talked about that you are aware of?

Dr. Smith:      I'm not aware of those being studies, those being symptoms of sexual abuse, in any scientific study.

Mr. Eaman:      Have you researched the literature in this area as part of your profession and ongoing job?

Dr. Smith:      Many times.

Mr. Eaman:      And are you familiar with the literature in this area?

Dr. Smith:      Yes.

*Id.* at 73-74.

As previously noted, despite the fact that she was unable to identify any particular article, study, or research finding to support her testimony, Cross opined at length regarding alleged statistical evidence which supported her opinions.  With respect to this testimony, Dr. Smith testified as follows:

-34-

Mr. Eaman:    How about the percentages she gave of people identified in those studies, the percentage of people who supposedly reported these themes, patterns or symptoms, are those percentages supported by the studies within your knowledge?

Dr. Smith:    Those percentages don't correlate with any studies that I'm aware of or I researched, that I've looked at. **It appears that she may have misled the jury in thinking those were scientific studies**. I saw no evidence of cites, any authors, any research, that I understand indicates those percentages.

*Id.* at 74-75.

While Cross was unable to identify any specific article, study, or research finding which supported her testimony, she did identify three particular authors whose work, in general, provided a basis for her testimony: Deborah Poole, Kathleen "Faller," and William Marshall. (Trial Transcript, August 26, 1998, 548-53). Regarding Cross' alleged reliance on these particular researchers, Dr. Smith testified that they had not published work supportive of Cross' opinions and conclusions. (Hearing Testimony, November 2, 1999, 77-78, 80, 82). Specifically, Dr. Smith testified that Kathleen Fowler and Deborah Poole did not perform research in the area of female teenagers who alleged sexual abuse, but instead conducted research regarding the proper protocol of interviewing *children* who have alleged sexual abuse. *Id.* at 78. As for William Marshall's research, Dr. Smith testified that it deals "with sex offenders, not adolescents. Teenage females who have alleged sexual abuse, it's not his field at all." *Id.* at 82.

As observed above, counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." There is no dispute that

Petitioner's attorneys decided to excuse Dr. Smith from testifying without first investigating what she could offer in support of Petitioner's defense. Counsel's decision not to investigate what Dr. Smith could potentially offer was patently unreasonable and constituted deficient performance. Concomitantly, counsel's decision not to present testimony from Dr. Smith also constituted deficient performance. Plachta's excuse that he wanted to avoid a "battle of the experts," while perhaps an appropriate strategy in some circumstances, was utterly foolish in Petitioner's case.

This was not a case where there existed any direct evidence implicating Petitioner. Had there existed any such evidence, the potential significance of any opinion testimony presented by a prosecution witness *might* have been diminished. However, given the complete absence of direct evidence implicating Petitioner, any opinion testimony (such as that offered by Cross) could reasonably be expected to assume much greater significance. This expectation was certainly accurate in this matter, as the case against Petitioner hinged on Cross' testimony. The alleged victim's testimony was, to put it politely, inconsistent. Cross, however, salvaged the prosecution's case by testifying that the numerous inconsistencies in the alleged victim's testimony did not detract from her credibility, but, in fact, demonstrated that she had been sexually assaulted.

Moreover, this was not a case in which the prosecution's decision whether to present expert testimony was premised on whether Petitioner decided to present such evidence. In such a circumstance, it *might* constitute reasonable strategy to forego expert testimony, as such would serve to deprive *both* parties of such. In this case, however, the prosecution decided to present Cross' testimony regardless of whether Petitioner presented expert testimony. In other words, the prosecution determined to go to battle in this matter with the benefit of expert testimony in its arsenal. Plachta's decision to not present testimony from Dr. Smith, having conducted absolutely no investigation of what the doctor's

testimony might be, rather than preventing a "battle of the experts," only ensured that the subsequent battle was a one-sided affair crippling Petitioner's ability to defend the charges against him.

Plachta's decision to present no counter to Cross' testimony represents an utter failure of the adversary process which the Sixth Amendment is designed to protect. Having established that counsel's performance in this regard was constitutionally deficient, the question becomes whether such prejudiced Petitioner's ability to secure a fair trial. In this respect, the issue is whether there exists a "reasonable probability" that, but for counsel's unprofessional errors, the outcome of Petitioner's trial would have been different. As noted above, a reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome." To properly assess the prejudicial impact of counsel's failure to present testimony from Dr. Smith, it is necessary to first evaluate the strength of the evidence of Petitioner's guilt presented at trial.

As detailed above, the alleged victim testified that the incident in question occurred on an unspecified Sunday in May 1997. She testified that the incident occurred after Petitioner picked her up from work at the Bluebird restaurant. The alleged victim worked at the Bluebird restaurant on three Sundays in May 1997: the 11th, 18th, and 25th.

The incident in question could not have occurred on May 11, 1997. The alleged victim testified that the incident occurred on a day that she assisted with brunch at the restaurant. The manager of the Bluebird restaurant testified that brunch is not served on Mother's Day, which in 1997 fell on May 11th. The alleged victim herself conceded that given her work schedule the incident could not have occurred on May 25, 1997. According to the alleged victim's own testimony, therefore, the alleged incident could only have occurred on May 18, 1997. The parties stipulated that on May 18, 1997, H.H. worked from 9:46 a.m. until 3:37.

It was undisputed at trial that during the month of May 1997, Petitioner worked the 7:00 a.m. through 3:00 p.m. shift.  Petitioner testified that he worked on May 18, 1997, an assertion confirmed by Petitioner's wife, and the prosecution presented no evidence to the contrary.  Petitioner testified that on May 18, 1997, his shift ended at 3:00 p.m. and that he departed the police station at approximately 3:30.  The prosecution presented no evidence to the contrary.  Petitioner's testimony in this regard was consistent with that offered by the alleged victim's mother who testified that Petitioner generally remained at the police station for a brief period of time following the end of his shift.  The prosecution presented no evidence to the contrary.

Petitioner testified that he did not pick up H.H. from work on this date (or any of the other Sundays that she worked that month).  The alleged victim's mother confirmed this and, furthermore, testified that she picked her daughter up from work on May 18, 1997.  Aside from the alleged victim's vague and contradictory assertions, the prosecution presented no evidence to the contrary.

Petitioner testified that the police station was located 9-10 miles from his residence.  This was not disputed.  Petitioner testified that when he left the police station on May 18, 1997, he went straight home and changed clothes to go play golf.  This was confirmed by his wife and the prosecution presented no evidence to the contrary.  Petitioner arrived at the golf course a few minutes after 4:00 p.m.  After playing golf, Petitioner socialized with his playing partners for a brief time before returning home.  The prosecution presented no evidence to the contrary.

This chronology regarding the events of May 18, 1997, confirmed by the testimony of several individuals and unrefuted by any evidence presented by the prosecution, is entirely inconsistent with the alleged victim's allegations.  In sum, while the alleged victim testified that she was sexually

assaulted on one of three Sundays in May 1997, there was no other evidence presented at trial (other than Camuso's and Breneman's parroting of the alleged victim's testimony) supporting her story.

The testimony regarding the alleged victim's July 1997 telephone call to Lana Camuso casts further doubt on the outcome of Petitioner's trial. Camuso and H.H. related different stories regarding this conversation. More importantly, H.H.'s brother testified that contrary to his sister's (and Camuso's) testimony, H.H. never cried during the conversation, but instead laughed and expressed the desire to get Petitioner out of the house and live with Camuso.

Further supporting the theory that H.H. fabricated her allegations in an attempt to force Petitioner out of the house and thereby secure the ability to live elsewhere, was the extensive testimony that H.H. violently resented any attempts at discipline by Petitioner. H.H. repeatedly expressed to her parents that she could act in whatever way she wished and that Petitioner had no right to discipline her. It was also revealed at trial that H.H.'s July 1997 telephone call to Camuso was contemporaneous with a particularly contentious dispute which Petitioner and his wife experienced with H.H. regarding their decision to not let her attend a particular concert.[14]

Considering the evidence presented at trial, no reasonable person could possess confidence in the jury's verdict. The only possible rationale, therefore, for the jury's decision (aside from racial bias) is that it accorded overwhelming significance to the testimony of Barbara Cross and her allegedly expert opinion that the numerous inconsistencies in the alleged victim's story were, in fact, evidence in support of her claims. As detailed above, had Dr. Smith been called to testify at trial, she

---

[14] As discussed below, there existed additional evidence further demonstrating H.H.'s resistance to any parental control and expressing her desire to force Petitioner out of the house. However, counsel inexcusably failed to introduce this evidence.

would have demonstrated that Cross lied about her credentials and, furthermore, would have raised serious doubts regarding the credibility and accuracy of Cross' allegedly expert opinions.

The impact of Dr. Smith's potential testimony, coupled with the paucity of credible evidence supporting Petitioner's guilt, compels the conclusion that there exists a reasonable probability that absent counsel's constitutionally deficient performance - his failure to present the testimony of Dr. Barbara Jones Smith - the outcome of Petitioner's trial would have been different.  The decision by the Michigan Supreme Court on this issue is contrary to, and involves an unreasonable application of, clearly established federal law as articulated by the United States Supreme Court.  Accordingly, the Court concludes that Petitioner's conviction and continued detention violates his rights under the United States Constitution.

B.        Failure to Introduce Various Letters Written by H.H.

On or about March 31, 1998, the alleged victim's mother provided defense counsel with several letters written by her daughter.  (Hearing Transcript, November 2, 1999, 176-77).  Despite being provided with this evidence several months before the start of Petitioner's trial, counsel failed to timely disclose the existence of such and was, therefore, prevented from introducing the letters into evidence at trial.  *People v. LeBlanc*, No. 99-959-FH, Opinion at 8 (Leelanau County Cir. Ct., April 10, 2000) (noting that "defense, in response to the prosecution's standard discovery request, failed to disclose these letters prior to trial").[15]   At the Ginther hearing, attorney Plachta testified that these letters were

---

[15]   Neither the Michigan Court of Appeals nor the Michigan Supreme Court addressed Petitioner's claim that counsel was ineffective for failing to introduce these letters into evidence.  The trial court, however, addressed this claim in its opinion denying Petitioner's motion for a new trial.  Thus, it is the trial court's assessment of this claim that is presently relevant.

"valuable." (Hearing Transcript, March 1, 2000, 12). This testimony is consistent with Plachta's pretrial statement that the "information [in these letters] is extremely valuable." (Dkt. #3 at 75).

The trial court concluded that counsel's failure in this regard constituted valid strategy. *People v. LeBlanc*, No. 99-959-FH, Opinion at 8 (Leelanau County Cir. Ct., April 10, 2000). The court further concluded that even if counsel was deficient in failing to introduce these letters the impact of such was inconsequential because the information in the letters was "covered by other testimony." *Id.* A review of these letters, however, reveals that the trial court's determination is contrary to clearly established federal law as articulated by the United States Supreme Court. The Court agrees with attorney Plachta that the information contained in these letters was extremely valuable. The Court further concludes that counsel's failure to proffer them as evidence constituted deficient performance which prejudiced Petitioner's ability to obtain a fair trial.

At the Ginther hearing, counsel attempted to rationalize his failure to abide by the trial court's discovery rules by suggesting that such was part of a grand strategy. (Hearing Transcript, March 1, 2000, 42-55). Counsel failed, however, to explain the nature of this strategy or the strategic purpose underlying his failure to comply with the court's discovery rules.

While the Court recognizes that the decision not to introduce evidence can constitute a valid strategic decision, the Court fails to discern how the failure to abide by the relevant court rules and, therefore, be denied the ability to introduce evidence can ever constitute valid strategy. In other words, by failing to comply with the relevant discovery rules, counsel was effectively denied the ability to make the strategic decision whether to introduce the letters in question, the decision instead being imposed upon counsel by application of the trial court's discovery rules. The Court easily concludes that

counsel's failure constitutes deficient performance.  The Court further concludes that counsel's failure prejudiced Petitioner's ability to obtain a fair trial.

The alleged victim testified that she did not report her allegations of sexual abuse because she did not want to become separated from her family.  (Trial Transcript, August 25, 1998, 293).  When confronted with evidence that she had, on a previous occasion, expressed hatred of Petitioner, as well as the desire to live elsewhere, H.H. responded that she had expressed such feelings on only that single occasion.  (Trial Transcript, August 25, 1998, 327-30; Trial Transcript, August 25, 1998, 342-61).

Having failed to comply with the relevant discovery rules, counsel was unable to demonstrate that this testimony was false.  In one of the letters at issue, the alleged victim stated that she was planning to move out and had already arranged a "place to stay." (Dkt. #3 at 49).  She further stated that she was planning to move out because she refused to submit to her parents' attempts to impose any discipline on her.  *Id.*  Moreover, in another letter, dated July 7, 1997,[16] the alleged victim wrote that

> Ya know what.  Bill (my ma's unsignificant other) is a fag.  He tries to like run my life and be my dad but I don't want his fat hairy ass to live with us what about (sic) be my dad.

(Dkt. #3 at 71).

The contents of this letter, written only one week before H.H. telephoned Lana Camuso to report her allegations of sexual assault, contradicts the alleged victim's testimony that she asked Camuso not to divulge her "secret" because she did not want her family separated.  (Trial Transcript, August 25, 1998, 242).  This evidence also bolsters C.H.'s testimony that during the alleged victim's July 1997 telephone call to Camuso, she was laughing, expressed the desire to "get [Petitioner] out of

---

[16]  The date on the letter reads "July 7, Monday."  July 7, 1997, was a Monday.  During the time period relevant in this matter, the only date on which July 7th fell on a Monday, was July 7, 1997.

the house," and told Camuso that "if she got rid of [Petitioner], that [her] mom would let her go live with Lana." (Trial Transcript, August 27, 1998, 727-33). This evidence also supports the theory that the alleged victim invented her allegations in an attempt to live elsewhere and/or get Petitioner removed from her family. Finally, contrary to the trial court's conclusion this evidence was not "covered by other testimony at trial."

The alleged victim also repeatedly testified that she was disciplined unreasonably for inconsequential transgressions such as eating too much cereal, arguing with her brother, failing to clean something, or eating her brother's candy. (Trial Transcript, August 25, 1998, 215, 253; Trial Transcript, August 26, 1998, 342-45). However, letters which counsel failed to introduce reveal an entirely different portrait of the alleged victim than that so carefully crafted by the prosecution.

In a letter dated September 6, 1996, the alleged victim wrote the following:

> Hey, wassup. I'm so bored. I'm just chilling in my room listening to No Doubt. That's about all I can do. Okay first I had a beer at work and my mom smelled it on me (after I brushed my teeth) so I had to quit my job. Then when my ma was on her honeymoon Lyndsi's ma found out we was huffing gas[17] and she told my ma when she got back and she's being a bitch. She's <u>way</u> <u>too</u> protective so she thinks I'm grounded until X-mas. Fuck that! After next week she can kiss my ass cuz I can't stand it much longer and I'm going to a party. She thinks I ain't going to homecomin but she can just go to hell cuz I'm goin and if she thinks she's gonna stop me she can kiss my ass. Don't ya think she's too strict?
>
> She should know I'm gonna be makin up for lost time once I'm ungrounded. Oh, yeah she was thinking about putting me in some treatment center cuz she thinks I'm an alcoholic. I ain't an alcoholic. I can go a week w/out something to drink! That's pretty good, huh? I got 1/5 of bacardi under my bed for homecoming night. I can't wait!

---

[17] The phrase "huffing gas" refers to the act of sniffing an inhalant such as gas or glue. *See* Drug Slang Dictionary - Inhalants, *available at*, http://parentingteens.about.com/cs/inhalants/l/blsldicinhal.htm (last visited on July 25, 2005); Common Street Names for Drugs, *available at*, http://www.sosdrugs.org/streetnames.html (last visited on July 25, 2005); Inhalants, *available at*, http://www.mhsainc.org/inhalents.htm (last visited on July 25, 2005).

(Dkt. #3 at 57-58).

In another letter, dated September 14, 1996, the alleged victim wrote the following:

Hey, wassup?  Guess what!  The reason I didn't call you back on Wed.
night is cuz I had to go to the hospital.  I got too drunk and I passed out.
. .Plus I was freakin out about my dad and I couldn't understand why
nobody could get him.  After I got it through my head (where he was) I
hit my brother (hard) cuz he wouldn't choke me so I could be with him.

(Dkt. #3 at 53-54).

Again, this evidence was not "covered by other testimony."  While the alleged victim's

mother testified regarding a single episode of alcohol abuse by her daughter, these letters reveal that

H.H. suffered from a much more extensive problem with substance abuse.  Moreover, these letters were

written by the alleged victim - not her mother.  Thus, while there perhaps exists some overlap between

these letters and the testimony of H.H.'s mother, the latter cannot be said to "cover" the former.

Moreover, these letters support the testimony of the alleged victim's mother, an important consideration

in a trial where everything hinged on the jury's assessment of credibility.  Furthermore, these letters

reveal that the alleged victim, contrary to her protestations of persecution, openly defied parental

authority and engaged in a variety of unsafe behaviors for which punishment was not unreasonable.

As previously observed, the prosecution presented no evidence directly implicating

Petitioner.  Instead, the prosecution's case against Petitioner hinged upon the perceived credibility of the

alleged victim's allegations.  In such a circumstance, the evidence contained in these letters takes on a

heightened importance because of their potential impact on the alleged victim's credibility.  In light of

the utter paucity of credible evidence supporting Petitioner's conviction, the Court concludes that there

exists a reasonable probability that the introduction of the letters at issue would likely have resulted in

a different outcome.  The decision by the trial court on this issue is contrary to, and involves an

unreasonable application of, clearly established federal law as articulated by the United States Supreme Court.  Accordingly, the Court concludes that Petitioner's conviction and continued detention violates his rights under the United States Constitution.

C.        Failure to Question Potential Jurors Regarding Racial Bias

Petitioner is a Native-American and his step-daughter is Caucasian.  Prior to the outset of trial, Petitioner and his wife were provided with a list of the individuals from whom the jury would be selected.  (Hearing Transcript, March 1, 2000, 58-59; Hearing Transcript, March 3, 2000, 11). Petitioner and his wife reviewed this list and identified several potential jurors who they described as "rednecks. . .racist people that lived in the area for a long time."  (Hearing Transcript, March 1, 2000, 95).  Petitioner and his wife shared this information with counsel.  *Id.*

Naturally, Petitioner was concerned that his fate would not be judged by a jury of fair-minded citizens, but would instead rest in the hands of individuals harboring racial animus towards Native-Americans.  Petitioner and his wife repeatedly requested that counsel question potential jurors concerning racial bias.  (Hearing Transcript, November 2, 1999, 189-90, 195-96; Hearing Transcript, March 1, 2000, 95-96; Hearing Transcript, March 3, 2000, 27-28).  Despite recognizing that "state-wide there is racism against Native-Americans," attorney Plachta concluded that racial bias on the part of potential jurors "was not important and would not be an issue" in Petitioner's trial.  (Hearing Transcript, November 2, 1999, 188; Hearing Transcript, March 1, 2000, 84).  Attorney Hunt likewise concluded that potential racial prejudice by potential jurors was not a relevant issue.  (Hearing Transcript, March 3, 2000, 11).

Disregarding Petitioner's repeated requests - based in part on information regarding *specific members of the jury pool* - that potential jurors be questioned about racial bias, as well as their own knowledge that racial prejudice against Native-Americans exists in Michigan, Petitioner's attorneys declined to question potential jurors about possible racial bias.  (Trial Transcript, August 25, 1998, 3-129).  At least one of the individuals identified by Petitioner as potentially harboring racial animus was seated as a juror in this matter.  (Dkt. #3 at 150-54; Trial Transcript, August 25, 1998, 3-129; Trial Transcript, September 2, 1998, 1156-57).

The Michigan Supreme Court concluded that counsels' decision not to question potential jurors about racial bias was a legitimate strategic decision because "unnecessary voir dire about racial matters might have [had] the effect of making race an issue when it was not."  *People v. LeBlanc*, 640 N.W.2d 583-87 (Mich. 2002).  The court further concluded that even if counsels' failure constituted deficient performance, Petitioner had not established that he suffered prejudice resulting therefrom.  *Id.*  The Court finds that this decision is contrary to, and involves an unreasonable application of, clearly established law as articulated by the United States Supreme Court.

At the Ginther hearing attorneys Hunt and Plachta both testified that the decision not to question potentials jurors as to racial bias was a conscious decision.  (Hearing Transcript, March 1, 2000, 27-28, 39-41, 56-60; Hearing Transcript, March 3, 2000, 5, 9-16).  However, neither attorney ever articulated a rationale for this decision or indicated that such resulted from consideration of the relevant facts and circumstances.  Thus, the conclusion that counsel's decision was based on a defined and predetermined strategy enjoys no support in the record.  Furthermore, even had counsel consciously determined not to question jurors about potential racial bias, such does not constitute - under the specific facts and circumstances of this case - a legitimate strategic decision.

It cannot reasonably be disputed that there exists in Michigan (including the vicinity in which this alleged incident occurred) racial prejudice against Native-Americans. As previously discussed, Petitioner informed his attorneys that certain members of the jury pool potentially harbored racial animus against Native-Americans. Several Native-Americans testified at the Ginther hearing about personally experiencing such prejudice. (Hearing Transcript, November 2, 1999, 123-69). An expert witness testified at the Ginther hearing regarding the widespread racial prejudice suffered by Native-Americans in the criminal justice system. *Id.* at 6-58. Petitioner has submitted documentary evidence demonstrating the existence of racial prejudice against Native-Americans in the local area. (Dkt. #3 at 5-25). Even the trial court recognized the existence of such racial bias, stating that "it would be ignoring the obvious to suggest that there is no prejudice against Native Americans in northern Michigan or in any part of Michigan for that matter." *People v. LeBlanc*, No. 99-959-FH, Opinion at 6 (Leelanau County Cir. Ct., April 10, 2000).

The conclusion by the Michigan Supreme Court that counsels' performance in this regard constituted a legitimate attempt to prevent the introduction of the issue of race into this matter simply ignores reality. Petitioner's attorneys no more controlled whether race was an issue in this matter than they controlled the sun and the moon. To put it bluntly, given the racial prejudice which exists against Native-Americans in the local area, race became an issue in this matter the moment Petitioner was charged with sexually assaulting a young Caucasian female. Because there existed no direct evidence supporting the alleged victim's story the jury was forced to decide Petitioner's fate based almost exclusively upon determinations of credibility. In such a circumstance, the ability of potential jurors to objectively evaluate testimony without regard for the race of a particular witness assumed a much greater importance than might otherwise be the case. Rather than being a secondary issue in this matter, race

assumed a heightened importance.  During the voir dire process, therefore, counsel should have actively sought to minimize its impact by eliminating biased jurors, instead of simply ignoring its presence.

Considering the nature of the prosecution's case against Petitioner (known to counsel prior to the outset of trial) and the acknowledged existence of racial prejudice against Native-Americans in the community, the Court concludes that counsels' failure to question potential jurors about racial bias constituted deficient performance.  To put it another way, the complete failure to recognize and address a legitimate issue simply cannot constitute a legitimate method of resolution thereof.

As for whether counsels' deficient performance prejudiced Petitioner's ability to obtain a fair trial, the Court concludes that it did.  Considering the absence of credible evidence supporting Petitioner's conviction, the Court finds it impossible to conclude that juror bias against Native-Americans played no role in the jury's decision to convict Petitioner.  Thus, the Court concludes that there exists a reasonable probability that effective questioning by counsel regarding racial prejudice would likely have resulted in the seating of a different jury and ultimately a different outcome.  The decision by the Michigan Supreme Court on this issue is contrary to, and involves an unreasonable application of, clearly established federal law as articulated by the United States Supreme Court.  Accordingly, the Court concludes that Petitioner's conviction and continued detention violates his rights under the United States Constitution.

D.       Remaining Claims of Ineffective Assistance

In addition to the claims discussed above, Petitioner has asserted several other claims of ineffective assistance.  As discussed below, however, the Court is not persuaded that any of these claims satisfies the standard articulated above.

1.          Failure to Object to Rebuttal Testimony

As noted above, in its rebuttal case the prosecution presented the testimony of James Loonsfoot, who testified that Petitioner allegedly falsified one of his time sheets in 1996.  Petitioner asserts that his attorneys were deficient for failing to object to this testimony.  The Michigan Supreme Court determined that this claim was without merit because "[i]n light of [Petitioner's] alibi defense, it is far from clear that [Petitioner's] inaccurate entry on another occasion was entirely a 'collateral matter.'"  *People v. LeBlanc*, 640 N.W.2d 246, 254 (Mich. 2002).  While the Court may not agree with this assessment, it is not an entirely unreasonable conclusion.  Thus, the Court cannot conclude that counsels' failure to object was deficient.  Moreover, considering the somewhat tangential nature of this evidence the Court cannot conclude that counsel's failure to object, even if constituting deficient performance, prejudiced Petitioner's ability to obtain a fair trial.


2.          Failure to Object to Expert's Testimony

Petitioner asserts that Barbara Cross should not have been permitted to testify in this matter because she had previously treated the alleged victim.  Petitioner asserts that the failure to object to her testimony constituted ineffective assistance.  Petitioner asserts that Cross should not have been permitted to testify "as a syndrome expert" and, furthermore, should not have been permitted to testify that she was the alleged victim's treating therapist.

First, the Michigan Supreme Court has held that "an expert may testify regarding typical symptoms of child abuse for the sole purpose of explaining a victim's specific behavior that might be incorrectly construed by the jury as inconsistent with that of an abuse victim *or* to rebut an attack on the

victim's credibility." *People v. Peterson*, 537 N.W.2d 857, 868 (Mich. 1995). Thus, Michigan appears to permit the very type of testimony about which Petitioner objects.

Moreover, to the extent that Petitioner asserts that Cross improperly testified that she was the alleged victim's therapist, the Court notes that this information was brought to the jury's attention by Petitioner's attorneys not the prosecutor. While counsel's approach to countering the testimony of Barbara Cross was constitutionally deficient, there does not appear to have been any valid basis on which to prevent Cross from testifying.

### 3. Defense Counsel Shifted the Burden on Proof

Petitioner asserts that his trial counsel rendered ineffective assistance by improperly informing the jury that "the innocence of the defendant will be proven beyond a reasonable doubt." This is a mischaracterization of counsel's actual statements, which suggested to the jury that (1) Petitioner would demonstrate why he (instead of the alleged victim) should be believed, and (2) that the evidence will demonstrate that Petitioner is not guilty. (Trial Transcript, September 1, 1998, 1063-1103). Such sentiments hardly served to shift the burden of proof. Moreover, even if counsel's comments were somehow improper, such isolated comments cannot overcome the presumption that jurors follow the court's instructions regarding the proper burden of proof in a criminal matter.

### 4. Failure to Object to Prior Consistent Statements

Petitioner asserts that his attorneys were ineffective for failing "to object to prior consistent statements of the complainant that were introduced by the prosecution." He asserts that such testimony violated Michigan Rule of Evidence 801, which defines hearsay. Petitioner has failed to

identify the precise testimony to which he feels his attorneys should have objected.  Nonetheless, the Court assumes that he is referring to the testimony of Lana Camuso and Rosa Breneman, both of whom testified regarding statements made by the alleged victim.

The Court disagrees with Petitioner that this such testimony was inadmissible hearsay. Evidence regarding the alleged victim's statements to Camuso and Breneman would have been, in the Court's estimation, admissible to demonstrate the effect that such statements had upon Camuso and Breneman.  In such a circumstance, the testimony would not violate the rule against hearsay because the statements would be introduced for a non-hearsay purpose.  Thus counsels' failure to seek to preclude such testimony was not ineffective.

Counsel can perhaps be faulted, however, for failing to obtain from the trial court a limiting instructing informing the jury of the limited use of such evidence (i.e., such can be considered only to demonstrate the effect that such statements had on the listener, but not to establish the truth of the assertions contained therein).  Even if such a failure were constitutionally deficient, however, the Court cannot conclude that the error deprived Petitioner of the right to a fair trial.

## II.        **Evidentiary Claims**  (Habeas Claims III-VI)

Petitioner asserts several claims that his right to a fair trial was violated as a result of certain evidentiary rulings by the trial court, each of which is addressed below.  While these claims reveal that the trial court *may* have erred as a matter of Michigan evidentiary law, the Court concludes that none of these particular claims merit habeas relief.

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding.  *See Clemmons v. Sowders*, 34 F.3d 352, 357

(6th Cir. 1994); *Clark v. O'Dea*, 257 F.3d 498, 503 (6th Cir. 2001). Habeas relief is warranted, however, if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Clemmons*, 34 F.3d at 357 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). This requires Petitioner to demonstrate "actual prejudice" resulting from a constitutional error. *Id*.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States. *Id*. In this respect, it is recognized that "errors of state law" which render a trial fundamentally unfair violate the constitutional guarantee of due process and, therefore, can serve as the basis for habeas relief. *See Norris v. Schotten*, 146 F.3d 314, 328-29 (6th Cir. 1998) (citing *Estelle*, 502 U.S. at 67-68). Fundamental fairness does not, however, "require a perfect trial." *Clemmons*, 34 F.3d at 358.


A.        False Testimony by Expert Witness  (Habeas Claim III)

As detailed above, the alleged victim's testimony in this matter was riddled with inconsistencies. In an effort to bolster H.H.'s inconsistent testimony the prosecution questioned Barbara Cross, a social worker who had previously treated the alleged victim. Petitioner alleges that Cross lied about her credentials and presented false testimony. Petitioner asserts that as a result his right to a fair trial was denied.

While the Court agrees that Cross appears to have lied about her credentials and presented allegedly false evidence in an effort to bolster the credibility of the alleged victim's testimony, such does not, standing alone, render Petitioner's trial constitutionally infirm. In support of this claim Petitioner

relies on state law and United States District Court authority.  As noted above, however, habeas relief can be based only upon a violation of clearly established law as articulated by the United States Supreme Court.  Petitioner has identified (and the Court has not located) any such authority.

Thus, while the Court finds Cross' testimony troubling, the remedy for such was effective cross-examination and the presentation of competing evidence.  While counsel's failure to properly respond to Cross' testimony violated Petitioner's right to the effective assistance of counsel, the mere presentation of such evidence did not violate Petitioner's right to a fair trial.

B.      Rebuttal Testimony  (Habeas Claim IV)

In its rebuttal case, the prosecution presented the testimony of James Loonsfoot who testified regarding a single incident in which Petitioner allegedly falsified a time sheet.  (Trial Testimony, September 1, 1998, 1007-11).  Petitioner alleges that the admission of this testimony was improper under Michigan law in that it represented improper impeachment on a collateral matter. Petitioner claims that the admission of this testimony violated his right to a fair trial.

The Michigan Supreme Court concluded that it was "far from clear" that Loonsfoot's testimony regarded a "collateral matter."  *People v. LeBlanc*, 640 N.W.2d 246, 253-55 (Mich. 2002). This determination, while perhaps questionable, is not completely unreasonable.  Thus, the Court cannot conclude that the admission of Loonsfoot's testimony was improper.  Moreover, even if the admission of this evidence was improper as a matter of Michigan evidentiary law, its admission did not serve to deprive Petitioner of the right to a fair trial.

C.      Testimony by the Alleged Victim  (Habeas Claim V)

Petitioner objects to the admission of three separate portions of the alleged victim's testimony, claiming that such deprived him of the right to a fair trial.  The Court disagrees, concluding that such did not deprive Petitioner of the right to a fair trial.

First, on direct examination, H.H. was asked whether she was telling "the God's honest truth."  (Trial Transcript, August 25, 1998, 254-55).  Over defense counsel's objection, H.H. was permitted to answer the question, which she did in the affirmative.  *Id.* at 255.  Petitioner asserts that this exchange reflected an attempt by the prosecution to improperly bolster the alleged victim's credibility.

Petitioner also objects to testimony offered by the alleged victim in the following exchange:

Counsel:    Ms. H, I was asking you some questions about your meetings with Ms. Cross and my question was during these meetings, at one or more of them, did Barbara Cross indicate - tell you her personal belief as to how alleged victims of child sexual abuse would act?

H.H.:        She said that -

Counsel:    That's a yes or no question.

H.H.:        - when I was -

Counsel:    No, no.  Please answer that yes or no.

Court:       I think I'll let her answer.  If she doesn't answer directly, then we'll come back.

Counsel:    All right.  Thank you, your Honor.

Court:       You need to answer the question.  Go ahead.

H.H.:        When I was talking to her, she would say that something that I said had something to do with

other cases or something, but that's all I remember.

Counsel:   Did she indicate to you that she had studied the literature with regard to - first of all, it wasn't responsive to my question and I would ask the answer be stricken.

Court:   I'll permit the answer, go ahead.

(Trial Transcript, August 26, 1998, 382).

Petitioner asserts that through this testimony the alleged victim was improperly "attempting to link her own behavior patterns to the behavior patterns of others in cases of sexual abuse." Finally, Petitioner objects to the following exchange, which occurred on re-direct examination of the alleged victim:

Prosecutor:   You indicated that you don't remember some things because you don't want to remember. If you are with a therapist and you are trying to help yourself, why don't you want to remember that?

H.H.:   Because I would rather just forget about it and move on and act like it never happened.

Prosecutor:   Then why are you willing to testify yesterday and today?

H.H.:   Because he did something wrong to me and I don't want somebody else to have to go through it.

*Id.* at 451.

Petitioner asserts that this testimony was improper in that it "buttress[ed] in the jury's mind that [H.H.] was testifying because she thought William LeBlanc was a danger to others" and,

furthermore, that (when linked with Barbara Cross' testimony) such "is a typical behavior pattern of sexual abuse victims."

The Constitution guarantees that every criminal defendant will receive a *fair* trial, but does not guarantee that every criminal defendant will receive a *perfect* trial. While objectionable, the admission of this particular testimony did not violate Petitioner's right to a fair trial. Such testimony was isolated and constituted a very minor portion of the alleged victim's testimony.

D.      Hearsay Testimony  (Habeas Claim VI)

As previously noted, the prosecution presented the testimony of Lana Camuso and Rosa Breneman, both of whom testified regarding statements which the alleged victim made to them regarding her allegations of sexual assault. Petitioner asserts that the admission of this testimony deprived him of the right to a fair trial. He further asserts that the admission of this testimony violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution. Trial counsel did not object to this testimony on the ground that it constituted impermissible hearsay or violated Petitioner's Sixth Amendment right of confrontation.

First, Petitioner's rights under the Confrontation Clause are not implicated here because Petitioner had the opportunity to cross-examine the alleged victim regarding the statements to which Camuso and Breneman testified. Moreover, Petitioner had the opportunity to cross-examine Camuso and Breneman regarding such statements.

Because defense counsel did not object to the admission of this testimony on hearsay grounds, the Court can only speculate as to whether any such objection would have been sustained. Nevertheless, as discussed above, the Court concludes that admission of the challenged testimony was

not improper, as such was likely permissible for a non-hearsay purpose.  Accordingly, because this evidence was admissible, albeit for a limited purpose, Petitioner's right to a fair trial was not violated by its admission.

**III.**        **Constitutional Adequacy of Jury Voir Dire**  (Habeas Claim II)

Petitioner asserts that his due process rights were violated because the trial judge failed to question potential jurors regarding potential bias against Native-Americans.  In support of his claim, Petitioner asserts that

> The record below is filled with testimony by many witnesses that prejudice against Native Americans has been and continues to be a feature of life in the Traverse City area. . .Recently, the day this case was argued to the Court of Appeals, someone decorated a car in Traverse City with the words "Indian Scum."
>
> If this trial of a sex crime had occurred in the South, and the defendant was black and the complainant white, it would not take any court thirty seconds to reverse a conviction where there were *no questions* to prospective jurors as to whether they harbored prejudice against a black man. For Native Americans, Traverse City and Leland are the South, and they are the blacks.

(Petitioner's Brief at 50).

The United States Supreme Court has long held that in circumstances of extreme racial tension, *see Ham v. South Carolina*, 409 U.S. 524 (1973), or interracial violence, *see Turner v. Murray*, 476 U.S. 28 (1986), the Due Process Clause requires the trial court to question jurors as to potential racial bias.  *See also, Dennis v. Mitchell*, 354 F.3d 511, 524 (6th Cir. 2003).  However, the Constitution does not obligate the trial court to question prospective jurors as to racial prejudice "in every case where the races of the defendant and the victim differ."  *Mu'Min v. Virginia*, 500 U.S. 415, 423 (1991).

-57-

Furthermore, "a defendant cannot complain of a judge's failure to question the venire on racial prejudice unless the defendant has specifically requested such an inquiry." *Turner*, 476 U.S. at 37.

Petitioner's claim fails for two reasons. First, while the Court does not dispute that race was an important issue in this matter, the record does not support the conclusion that the allegations against Petitioner involved extreme racial tension or interracial violence, *as those concepts have been used by the United States Supreme Court*. Thus, there does not exist clearly established federal law that the Due Process Clause obligated the trial court to inquire about potential racial bias. Furthermore, Petitioner's attorneys never requested that the trial court undertake any such questioning. Accordingly, this particular claim does not justify habeas relief. As previously discussed, however, counsels' failure to question potential jurors as to racial bias violated Petitioner's Sixth Amendment right to the effective assistance of counsel.

## CONCLUSION

For the reasons articulated herein, the Court concludes that LeBlanc is being confined in violation of the United States Constitution. Accordingly, the Court recommends that LeBlanc's petition for writ of habeas corpus be **granted**. The Court further recommends that Petitioner be immediately released from custody on bond and that the State of Michigan either retry Petitioner within 120 days or completely release Petitioner from its authority and control.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  August 8, 2005                        /s/ Ellen S. Carmody                    
                                          ELLEN S. CARMODY
                                          United States Magistrate Judge